UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X
                                                :

DEMOS P. DEMOPOULOS, STEPHEN MALONE,
and MICHAEL SPINELLI, as Union Trustees and
Fiduciaries of the LOCAL 854 PENSION FUND and
the LOCAL 854 HEALTH AND WELFARE FUND,

                       Plaintiffs,

              -against-

JOHN CURCIO, WILLIAM CASSESE, and
KENNETH BARRETT, as Employer Trustees of the
LOCAL 854 PENSION FUND and the LOCAL 854
HEALTH AND WELFARE FUND,

                     Defendants.

-------------------------------------------------------------------- X

**REPORT AND**
**RECOMMENDATION**
2:20-cv-01208 (RRM)(PK)

Peggy Kuo, United States Magistrate Judge:

On March 5, 2020, Plaintiffs Demos P. Demopoulos, Stephen Malone, and Michael Spinelli commenced this action against Defendants John Curcio, William Cassese, and Kenneth Barrett . (Compl., Dkt. 1.) Plaintiffs and Defendants are the union and employer trustees, respectively, of the Local 854 Pension Fund and the Local 854 Health and Welfare Fund (collectively, "Funds"). (Am. Compl, Dkt. 22, at 1.) Plaintiffs assert that Defendants violated the terms of the trust agreements governing the Funds and their fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA"). Among the acts alleged to constitute these violations was Defendants' delivery of a Notice of Intention to Arbitrate ("Notice") to Plaintiffs. (Am. Compl. ¶ 1.) Thus, at the same time that they filed the Complaint, Plaintiffs also moved for an Order to Show Cause for Preliminary Injunction enjoining Defendants from seeking arbitration. ("Motion," Dkt. 2.) On March 13, 2020, the Honorable Roslynn R. Mauskopf referred the Motion to the undersigned. (Mar. 13, 2020 Order.)

## FACTUAL BACKGROUND

The following facts are taken from the Amended Complaint unless otherwise noted.[1]

The Funds "were established pursuant to the terms of collective bargaining agreements between" the union Local 854 and various employers. (Am. Compl. ¶ 7.) The Funds are overseen by a Board of Trustees ("Board") and governed by two trust agreements, the Local 854 Pension Trust Agreement (Am. Compl. Ex. A) and the Local 854 Health and Welfare Trust Agreement (Am. Compl. Ex. B, together with the Local 854 Pension Trust Agreement, the "Trust Agreements"). (*Id.* ¶ 2.) "The Funds are maintained for the purposes of collecting and receiving contributions and providing retirement and health and welfare benefits pursuant to and in accordance with the Trust Agreements." (*Id.* ¶ 7.)

On or about June 2013, Local 854 and Local 550 merged into Local 553. (*Id.* ¶ 14.) Although Local 553 is the surviving union, its members still participate in the Funds, which continue to be governed by the Trust Agreements. (*See id.* ¶¶ 5, 13-15.)

Three lawyers serve as "co-counsel" to the Funds. (*Id.* ¶ 24.) Two of the lawyers, Eugene S. Friedman and Anusha Rasalingam, are from the firm Friedman and Anspach ("F&A"), and the third lawyer, Jeffrey Pollack, is from Mintz & Gold LLP ("M&G"). (*Id.*)

Advance Transit Co. Inc. ("Advance") is one of the businesses whose employees are members of Local 553. (*See id.* ¶¶ 5, 9, 12.) Its owner, Defendant Barrett, is one of the Funds' employer trustees. (*Id.* ¶ 9, 12.) During a "routine payroll audit of Advance for the period of January 1, 2013 through December 31, 2017," the Funds "found unpaid contributions [to the Funds] in the amount of $161,498.52, plus interest, liquidated damages, costs, and fees pursuant to ERISA and the collection policy of the Funds." (*Id.* ¶ 28.) The Board and Advance "unsuccessfully" "attempted to settle this

---

[1] An Amended Complaint was filed on March 30, 2020, after the Motion was fully briefed. Although the Motion refers to the original complaint, this Report and Recommendation cites to the Amended Complaint because it is the operative pleading.

matter" "[f]or almost a year and a half." (*Id.* ¶ 29.) "In the course of the settlement negotiations," Pollack "argued that [the Funds could] not [ ] pursue Barrett for the monies due." (*Id.* ¶ 30.) On January 14, 2019, he drafted a memo to this effect, which "cit[ed] state law," but "not [ ] ERISA." (*Id.*) F&A provided Pollack with "federal ERISA cases . . . and advised the Board [ ] that collecting contributions found to be due pursuant to an audit fell within the fiduciary duties of the Trustees to the participants of the Fund[s]." (*Id.*) Subsequently, on June 19, 2019, the Board "voted unanimously to authorize [F&A] to file suit against Advance." (*Id.* ¶ 31.) "Barrett recused himself from discuss[ing] or voting on" whether to bring the suit. (*Id.*) F&A filed the suit approximately one month later, on July 23, 2019.[2] (*Id.* ¶ 32.)

On October 2, 2019, during the pendency of the Funds' suit against Advance, the Board held a meeting at which Barrett announced that "Advance had ceased operations on or about September 30, 2019." (*Id.* ¶ 33.) After the meeting concluded, Barrett and Daniel Gatto, who was a union trustee at the time (*see id.* ¶ 21), "met alone in a separate office." (*Id.* ¶ 34.) "[E]ventually[,] Gatto asked [Plaintiff] Demopoulos to join them." (*Id.*) "Barrett told Demopoulos that he was selling Advance, but would remain employed there as a consultant, and that he could assist Local 553 in becoming the representative of his employees under the new ownership, if Demopoulos would 'just tell his lawyer to play nice' with respect to the Funds' lawsuit against Advance." (*Id.*)

The Board held a meeting on December 18, 2019.[3] (*Id.* ¶ 35.) Like many of the Board's meetings, the December 18 meeting was scheduled to start at 10:00 a.m. (*See id.* ¶¶ 35-37.) The union trustees' "practice" was to assemble at a "café [ ] before the meeting and then head up to the meeting

---

[2] This lawsuit resulted in a consent judgment on October 14, 2020. *See Demopoulos v. Advance Transit*, No. 19-CV-4240 (JS)(ARL) (E.D.N.Y., filed July 23, 2019).

[3] Although the Amended Complaint sometimes refers to the date of this meeting as December 19, 2019 (*see, e.g.,* Am. Compl. ¶¶ 67-68), it appears undisputed that the meeting took place on December 18, 2019. (*See id.* at 9 (entitling this section of the Amended Complaint, "The December 18, 2019 Trustees' Meeting"), ¶ 35, Exs. C & D.)

at around 10:30 a.m." (*Id.* ¶ 37.)  "At 9:55 a.m. . . . , Gatto sent an email from his personal email address to Pollack, Barrett, Cassese, Curcio, Friedman and Albert J. Alimena of the Dickinson Group, the Fund Administrator, stating that he was removing Demopoulos as Trustee to the [ ] Funds and appointing [another individual] to be Demopoulos' replacement." (*Id.* ¶ 38.)  When Demopoulos and lawyers Rasalingam and Friedman arrived at the meeting, "Pollack told them that Gatto had removed Demopoulos as [a] Trustee of the Funds [and] that the Trustees had voted to replace [F&A] with his own firm, [M&G]." (*Id.* ¶ 40.)  Demopoulos informed the "Board that Gatto did not possess authority to remove Trustees under the Local 553 By-Laws." (*Id.* ¶ 41.)  Instead, only the union's executive board can remove a union trustee of the Funds.  (*Id.*)  "Pollack refused to accept the validity of the By-Laws," "insist[ing] that Gatto had removed Demopoulos in writing, which was all that was required under the Trust Agreements." (*Id.*)

"Demopoulos, Rasalingam, and Friedman then left the [Board] meeting, and Demopoulos called an emergency meeting" of the union's executive board, including Gatto, "via teleconference." (*Id.* ¶ 42.)  The union's board voted to remove Gatto as a Board trustee and replace him with Plaintiff Malone.  (*Id.*)  Demopoulos, Rasalingam, and Friedman then returned to the Board meeting, "informed the Board that Gatto had been replaced as Union Trustee by Malone," and "presented writings" to that effect, including "a letter from Malone indicating his acceptance of his appointment," "as required under the Trust Agreements." (*Id.* ¶¶ 43, 45.)

The minutes of the December 18 Board meeting (the "Board Minutes") discuss the purported removal of F&A as the Funds' counsel.  (*Id.* ¶ 44.)  The Board Minutes state that at 10:15 a.m., an "Executive Session [was] called." (Am. Compl. Ex. C at 1.)  The Executive Session was held while Gatto was still a Board trustee.  (Am. Compl. ¶ 44.)  According to the Executive Session's minutes (the "Executive Minutes"), Gatto, Defendant Curcio, and Barrett, were present in person for the Session, while Defendant Cassese was present by phone.  (Am. Compl. Ex. D.)  At the Session, Barrett

moved "to remove" F&A "due to [its] high fees and substitute in [M&G] on all current litigations." (*Id.*) Gatto seconded the motion; Curcio and Cassese abstained. (*Id.*) The Executive Minutes "do not state that a vote was held" on removing F&A and provides "[n]o explanation" for Curcio and Cassese's abstention. (Am. Compl. ¶¶ 50, 51.) Pollack drafted the Executive Minutes, "although he was not in attendance" at the Executive Session. (*Id.* ¶ 67.)

Both the Board Minutes and the Executive Minutes differ from how minutes were generally composed. Since 2015, "Rasalingam has attended Funds meetings and taken minutes for the Board." (*Id.* ¶ 52.) "[S]he circulates a draft copy of the minutes to co-counsel Pollack and the professional advisors to the Funds," who "then review and approve the draft minutes." (*Id.* ¶ 53 (citation omitted).) Once the advisors and Pollack approved the minutes, they were "presented to the Trustees for review and adoption by motion at the next [Board] meeting." (*Id.* ¶ 54 (citation omitted).) However, "[n]either the Executive [ ] Minutes nor the [Board] Minutes . . . were approved by the Funds' professional advisors [ ] or the Union Trustees." (*Id.* ¶ 68.) In addition, Board minutes "always" "record[ ] votes" by stating "that a motion was 'made, seconded, and unanimously adopted.'" (*Id.* ¶ 69 (citation omitted).) The Executive Minutes do not follow this format. (*Id.* ¶ 70.)

Plaintiffs further allege that the voting procedure reflected in the Executive Minutes was unusual. "During the five years in which Rasalingam has taken minutes for the Funds, there has never been a matter in which any Trustees have abstained from voting, though Trustees have recused themselves from discussion of actions to be taken with respect to the Trustee's own businesses." (*Id.* ¶ 65 (citation omitted).) During this time period, "the Trustees have [also] always voted unanimously in favor of any action to be taken by the Trustees." (*Id.* ¶ 66 (citation omitted).) However, two of the trustees, Curcio and Cassese, abstained. (*Id.* ¶ 50 (citation omitted).)

On February 18, 2019, the Notice was received at the offices of Local 553. (*Id.* ¶ 71.) Sent by Barrett, Curcio, and Cassese, the Notice states that "pursuant to the respective trust documents, the

Employer Trustees of the [Funds] intend to seek arbitration of the below-listed issues." (*Id.* Ex. E.)

The issues are:

1. Whether the vote during an Executive Session of the December 18, 2019 trustees meeting to remove Friedman & Anspach as counsel to the [Funds] was proper? If not, what shall the remedy be?

2. Whether the union trustees' subsequent refusal to allow removal of Friedman & Anspach as counsel to the [Funds] was proper? If not, what shall the remedy be?

(*Id.*)

## PROCEDURAL BACKGROUND

Plaintiffs filed the Complaint on March 5, 2020, asserting four causes of action: (1) the Notice violates the Trust Agreements and is a breach of Defendants' fiduciary duties under ERISA (*see* Compl. ¶¶ 57-63); (2) Barrett breached his fiduciary duties in attempting to influence F&A's prosecution of the Funds' suit against Advance and then moving to remove F&A in the Executive Session (*see id.* ¶¶ 64-74); (3) in sending the Notice, Defendants violated their fiduciary duties to act in the sole interest of the Funds' participants and beneficiaries (*see id.* ¶¶ 75-83); and (4) Barrett's actions during the Executive Session and in sending the Notice were invalid because he did not "qualif[y] as an Employer Trustee under the Trust Agreements." (*See id.* ¶¶ 84-90.)

At the same time, Plaintiffs also filed the Motion, requesting an order, pursuant to Rule 65 of the Federal Rules of Civil Procedure, enjoining Defendants from seeking arbitration pursuant to the Notice. (Mot. at 1.)[4] Plaintiffs filed a Memorandum of Law in Support of its Order to Show Cause for Preliminary Injunction ("Memorandum in Support," Dkt. 3) and the Affidavit of Demos P. Demopoulos in Support of Plaintiffs' Order to Show Cause for Preliminary Injunction (Dkt. 4).

---

[4] Although Plaintiffs' proposed order requests that the Court enjoin Defendants "from seeking Arbitration pursuant to their Notice of Arbitration, dated February 11, 2020, and from violating their fiduciary duties under Sections 404(a)(1)(A), 405, and 406(b) of [ERISA]" (Mot. at 1), Plaintiffs' briefing discusses only its request for an injunction barring arbitration and does not specify any further injunction. Accordingly, the undersigned considers only Plaintiffs' request to enjoin the arbitration preliminarily.

On March 9, 2020, Defendants filed an opposition to the Motion.  (Dkt. 18.)   At the same time, they also filed a Cross-Motion to Compel Arbitration as to "the dispute underlying this matter." (Dkt. 14.)  Their brief addresses both their opposition and their Cross-Motion.  (*See* Memorandum of Law in Opposition to Plaintiffs' Motion for a Preliminary Injunction and in Support of Defendants' Cross-Motion to Compel Arbitration ("Memorandum in Opposition"), Dkt. 18.)  The Memorandum in Opposition clarifies Defendants' position that "[a]ll of the claims Plaintiffs advance in this lawsuit fall within the scope of the Trust Agreements' arbitration provisions," and the Court should "dismiss Plaintiffs' Complaint and order the parties to arbitrate."  (*Id.* at 20.)[5]

Plaintiffs filed an Amended Complaint on March 30, 2020.  (Dkt. 22.)  Although the first three causes of action were the same as in the Complaint (*compare* Comp. ¶¶ 57-83 *with* Am. Compl. ¶¶ 88-115), the Amended Complaint asserted a different fourth cause of action: that Defendants brought the Notice in violation of the terms of the Trust Agreements and are therefore liable under § 301(a) of the Labor Management Relations Act, of 1947 ("LMRA").  (Am. Compl. ¶¶ 116-22.)  In the Amended Complaint, Plaintiffs request, among other relief, that the Court issue orders "permanently enjoining the invalidly noticed arbitration" and "permanently removing Barrett as Employer Trustee." (Am. Compl. at 24.)[6]

On April 4, 2020, oral argument was held on the Motion and the Cross-Motion to Compel.[7]

---

[5] Defendants also submitted the Declaration of John Curcio (Dkt. 15) and the Declaration of Jeffrey D. Pollack (Dkt. 16) in support of their opposition and Cross-Motion.

[6] On March 30, 2020, Plaintiffs also filed the Affidavit of Anusha Rasalingam in Further Support of Plaintiff's Order to Show Cause.  (Dkt. 21.)  Defendants moved to strike this affidavit on April 2, 2020.  ("Motion to Strike," Dkt. 24.)  In support of the Motion to Strike, they filed a factual affidavit (Dkt. 25) and a memorandum of law (Dkt. 26).  During the April 4, 2020 oral argument, the undersigned denied the Motion to Strike, stating that the Raslingam Affidavit, as well as the Motion to Strike and its supporting affidavit, will all be considered in assessing the Motion.  (*See* Apr. 4, 2020 Dkt. Entry.)

[7] Thereafter, on April 23, 2020, Defendants filed a motion to dismiss Plaintiffs' fourth cause of action and compel arbitration on the other three causes of action.  (Dkts. 35-36.)  Plaintiffs filed an opposition on May 18, 2020 (Dkt. 37), and Defendants filed their reply memorandum on May 27, 2020 (Dkt. 39).  The undersigned will address Defendants' Motions to Dismiss and Compel Arbitration in a separate report and recommendation.

(*See* Apr. 4, 2020 Dkt. Entry.)

## LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *JBR, Inc. v. Keurig Green Mountain, Inc.*, 618 F. App'x 31, 33 (2d Cir. 2015) (quotation and citation omitted) (original emphasis). "To obtain a preliminary injunction, the moving party must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest." *Schwartz v. Cerner Corp.*, 804 F. App'x 85, 87 (2d Cir. 2020) (quotation and citation omitted).

"To establish irreparable harm, a party seeking preliminary injunctive relief must show that 'there is a continuing harm which cannot be adequately redressed by final relief on the merits' and for which 'money damages cannot provide adequate compensation.'" *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (quoting *N.Y. Pathological & X-Ray Labs., Inc. v. INS*, 523 F.2d 79, 81 (2d Cir. 1975)). "[I]rreparable harm must be shown to be actual and imminent, not remote or speculative." *Id.*

Typically, "the moving party must first demonstrate" irreparable harm because it "is the *sine qua non* for preliminary injunctive relief." *JBR, Inc.*, 618 F. App'x at 33 (quotation and citation omitted). Irreparable harm in the context of a motion to enjoin an arbitration turns on "the merits of the petitioner's claim—the arbitrability of the dispute." *Int'l Bhd. of Elec. Workers, AFL-CIO, Loc. Union No. 3 v. Charter Commc'n*, 277 F. Supp. 3d 356, 365 (E.D.N.Y. 2017). "[I]rreparable harm exists when a party is forced to arbitrate a dispute that is not subject to arbitration, but no irreparable harm arises from arbitrating disputes that are subject to arbitration." *Pike Co. v. Tri-Krete Ltd*, 349 F. Supp. 3d 265, 275 (W.D.N.Y. 2018); *see also Medicine Shoppe Int'l, Inc. v. Mitsopoulos*, No. 4-CV-5207 (ERK)(MDG),

---

(Dkts. 14, 35; *see also* Apr. 30, 2020 Order referring Dkt. 35 to the undersigned.)

2006 WL 8438209, at *3 (E.D.N.Y. May 5, 2006), *R&R adopted*, 2006 WL 8438198 (E.D.N.Y. May 12, 2006) ("[W]here there is a valid agreement to arbitrate, no irreparable harm results from compelling the resisting party to arbitrate."); *Stop & Shop Supermarket Co. v. United Food & Com. Workers' Union Local 342*, 407 F. Supp. 2d 515, 518 (S.D.N.Y. 2005) ("Whether Plaintiff faces irreparable harm, has a likelihood of success on the merits, and whether the claim is a fair ground for litigation all depend on whether the terms of the arbitration agreement cover the [underlying dispute].").

The second part of the preliminary injunction inquiry requires the moving party to show either a likelihood of success on the merits or "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 (2d Cir. 2010) (quotation and citation omitted). "The 'serious questions' standard permits a district court to grant a preliminary injunction in situations where it cannot determine with certainty that the moving party is more likely than not to prevail on the merits of the underlying claims, but where the costs outweigh the benefits of not granting the injunction." *Id.* The moving party has the "burden" to "establish that the balance of hardships tips *decidedly* in its favor." *Id.* (quotation and citation omitted) (original emphasis).

"Finally, the court must ensure that the 'public interest would not be disserved' by the issuance of a preliminary injunction." *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

## ANALYSIS

## I.    Irreparable Harm

The first issue for the Court to consider is whether permitting the arbitration to proceed will cause irreparable harm to Plaintiffs.  The Second Circuit is clear: "A party suffers no legally cognizable injury at all, let alone irreparable injury, by being compelled to engage in arbitration to which he has

contractually agreed." *Lawrence v. Wilder Richman Secs. Corp.*, 417 F. App'x 11, 14 (2d Cir. 2010).

In assessing this question, the Court must decide whether the parties entered into a valid arbitration agreement, and if so, whether the issues in the Notice fall within the scope of the arbitration agreement. *See Jillian Mech. Corp. v. United Serv. Workers Union Loc. 355*, 882 F. Supp. 2d 358, 364 (E.D.N.Y. 2012). Related to these issues is whether the parties "clearly and unmistakably" agreed for an arbitrator to decide issues of arbitrability. *Id.* at 365.

## A.    Whether the Parties Entered into an Agreement to Arbitrate

The "initial task is to determine whether [the parties] entered into an agreement to arbitrate. Only when an agreement to arbitrate is found to exist does a court proceed to decide whether a given dispute falls within the scope of that agreement." *Spear, Leeds & Kellogg v. Cent. Life Assurance Co.*, 85 F.3d 21, 25 (2d Cir. 1996).

It is undisputed that the parties entered into an agreement to arbitrate through the two Trust Agreements, which contain the same arbitration clause ("Arbitration Clause"):

> If the Board of Trustees is unable to agree upon or to settle any of the matters that arise during the administration of this Fund, then upon written notice by the Union Trustees or the Employer Trustees, as the case may be, of the intent to arbitrate, the Board of Trustees shall promptly agree upon an impartial arbitrator to decide the matters in dispute. If the Board of Trustees, within fifteen (15) days after the matter in dispute has arisen, is unable to agree upon the selection of an impartial arbitrator, then either the Union Trustees or the Employer Trustees may petition the American Arbitration Association for a list of impartial arbitrators. The arbitrator shall promptly hear and render a final decision upon the matter in dispute but said arbitrator shall not have the power or authority to modify the basic provisions of the Agreement or the Plan. All costs of the arbitration shall be paid out of the Trust. It shall be incumbent upon the Board of Trustees to take or refrain from taking any action which may be indicated or necessary to give effect to the arbitrator's decision.

(Am. Compl. Ex. A Art. XII; Am. Compl. Ex. B Art. XII.) Neither party denies that they entered into the Trust Agreements or otherwise contends that the Arbitration Clause is not valid. (Mem. in Supp. at 16; Mem. in Opp. at 12-13.)

Accordingly, the parties entered into a valid agreement to arbitrate.

## B.     Whether the Arbitrator or Court Decides Arbitrability

The question of whether a dispute falls within an arbitration agreement's scope is generally one for the court to answer, although the parties to an arbitration agreement may contract to empower the arbitrator to determine his or her own jurisdiction. *See Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 120-21 (2d Cir. 2003). Arbitrability may be resolved by the arbitrator only when the contract, "as construed by the relevant state law," contains "*clear and unmistaken evidence*" of the parties' intent. *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005) (quotation, citation, and footnote omitted) (original emphasis).[8]

Plaintiffs argue that the clause lacks "a clear and unmistakable grant of [such] authority." (Mem. in Supp. at 17 (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).)

Defendants contend that it is "clear that the parties intended to submit the issue of arbitrability to the arbitrator" because "[t]he Trust Agreements explicitly reference that arbitration is to be conducted by the [American Arbitration Association ("AAA")] if the trustees cannot agree on an arbitrator." (Mem. in Opp. at 14-15 (citing *Contec Corp.*, 398 F.3d at 208; *Life Receivables Trust v. Goshawk Syndicate 102 at Lloyd's*, 66 A.D.3d 495 (N.Y. App. Div. 2009)).) According to Defendants, "[t]he operative AAA rules provide that 'the arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement the arbitrator may rule on arbitrability objections as a preliminary matter or as part of the final award.'" (*Id.* at 14 (quoting AAA Labor Arbitration R. R-3(a), (c)) (alterations omitted).)

"[W]hen [ ] parties explicitly incorporate [into their arbitration agreement] rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issue to an arbitrator." *Contec Corp.*, 398 F.3d at 208.

---

[8] Here, the Trust Agreements are governed by New York law (Am. Compl. Ex. A. Art. X § 4; Am. Compl. Ex. B Art. X § 4), "which follows the same standard as federal law with respect to who determines arbitrability." *Contec Corp.*, 398 F.3d at 208 n.1.

However, the Arbitration Clause does not explicitly incorporate or even mention the AAA's rules. *Cf., id.* (holding that the AAA rules are explicitly incorporated when the arbitration clause provided that "[i]n the event the parties are unable to arrive at a resolution, such controversy shall be determined by arbitration held in the City of Albany, New York in accordance with the Commercial Arbitration Rules of the American Arbitration Association" (citation omitted)); *Life Receivables Trust*, 66 A.D.3d at 495 ("The arbitration agreement at issue requires that 'all disputes and differences arising under or in connection with this contract be referred to arbitration under the American Arbitration Association Rules.'" (alterations omitted)). Instead, the Arbitration Clause provides only that if the Board cannot agree on an impartial arbitrator, "then either the Union Trustees or the Employer Trustees may petition the American Arbitration Association for a list of impartial arbitrators." (Am. Compl. Ex. A Art. XII; Am. Compl. Ex. B Art. XII.) While permitting the trustees to obtain a list of arbitrators from the AAA, this provision falls short of explicitly incorporating AAA rules into the Arbitration Clause, including any rule empowering an arbitrator to decide issues of arbitrability. Defendants point to no other provision in the Arbitration Clause to support their contention that the parties intended the arbitrator, rather than the Court, to decide arbitrability.

Because the Arbitration Clause does not contain clear and unmistakable evidence of this intent, the Court shall decide issues of arbitrability.

### C.   *Whether the Disputes in the Notice Fall Within the Arbitration Clause's Scope*

Because "'arbitration is a matter of contract,'" the "parties cannot be compelled to arbitrate issues that they have not specifically agreed to submit to arbitration." *Shaw Grp.*, 322 F.3d at 120 (quoting *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986)). "Nevertheless, under the [Federal Arbitration Act], certain presumptions inform the analysis. Specifically, the federal policy in favor of arbitration requires that 'any doubts concerning the scope of arbitrable issues' be resolved in favor of arbitration." *Id.* (quoting *Moses H. Cone Mem'l Hosp. v. Mecury Constr. Corp.*, 460

U.S. 1, 24-25 (1983)).

By serving the Notice, Defendants sought to arbitrate two disputes, both related to an attempt to remove F&A as the Funds' counsel. The first poses the question, "Whether the vote during the Executive Session of the December 18, 2019 trustees meeting to remove [F&A] as counsel to the [Funds] was proper?" The second asks, "Whether the union trustees' subsequent refusal to allow removal of [F&A] as counsel to the [Funds] was proper?" If the answer to either question is, "No," then the follow-up question posed by the Notice is, "[W]hat shall the remedy be?" (Am. Compl. Ex. E.)

Plaintiffs challenge the arbitrability of these questions on the basis that "because there was no vote, Defendant Employer Trustees have not sufficiently alleged that there was an action taken that could form the basis of an arbitrable 'dispute or disagreement' under the Trust Agreement." (Mem. in Supp. at 2; *see also id.* at 15, 16-17.) They argue that the issues presented in the Notice fall outside the scope of the Arbitration Clause.

The Arbitration Clause is broad, directing the parties to arbitrate when "the Board of Trustees is unable to agree upon or to settle *any* of the matters that arise during the administration of th[e] Fund[s]." (Am. Compl. ¶ 73 (citations omitted) (emphasis added).) *See Vera v. Saks & Co.*, 335 F.3d 109, 117 (2d Cir. 2003) ("The language in the [collective bargaining agreement], requiring arbitration of 'any dispute, claim, grievance or difference arising out of or relating to this Agreement which the Union and Employer have not been able to settle,' constitutes a broad arbitration clause."). The language of the Arbitration Clause does not "suggest an intention by the parties to limit the scope of the [C]lause." *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading, Inc.*, 252 F.3d 218, 225-26 (2d Cir. 2001) (holding that an arbitration clause that "mandates that 'any dispute arising from the making, performance or termination of this [contract]' be arbitrated" is broad (alteration omitted)). Broad clauses such as this "enjoy a presumption of arbitrability." *Sidney v. Verizon Commc'ns*, No. 17-CV-

1850 (RJD)(RLM), 2018 WL 1459461, at *3 (E.D.N.Y. Mar. 22, 2018) (quotation and citation omitted). "Indeed, where a broad arbitration clause is in play . . . 'in the absence of any express provision excluding a particular grievance from arbitration, only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail.'" *Pick Quick Food, Inc. v. United Food & Com. Workers Loc. 342*, 952 F. Supp. 2d 494, 498 (E.D.N.Y. 2013) (quoting *AT&T Techs.*, 475 U.S. at 650) (alteration omitted).

The Arbitration Clause does not require any "action"—let alone, a valid action—in order for there to be an arbitrable dispute or disagreement. The Arbitration Clause seeks to have an arbitrator resolve those issues on which the Board itself cannot agree. Here, it is clear that the members of the Board disagree as to whether F&A was properly removed as the Funds' counsel. Defendants contend that, yes, F&A was properly removed because there was a valid vote on December 18, 2019. (*See* Mem. in Opp. at 6.) Plaintiffs maintain the opposite: no, because there was no valid vote. (*See* Mem. in Supp. at 2.) Whether there was a valid vote—or any vote at all—is a matter that the Board "is unable to agree upon or to settle." Therefore, the first issue set forth in the Notice "falls squarely within the [A]rbitration [C]lause." *Cotter v. Shearson Lehman Hutton, Inc.*, 126 F.R.D. 19, 20 (S.D.N.Y. 1989).

Similarly, whether there was a "subsequent refusal" by Plaintiffs to remove F&A as counsel, and if so, whether it was "proper," is a question on which the parties also do not agree. Plaintiffs do not challenge this second question separately; their objection to this question is premised on the same argument as the first, that there was no "vote" by the Board. Because both questions are linked to the issue of *whether* there was valid action to remove F&A—with part of the Board saying yes and the other part saying no—the matter is also within the scope of the Arbitration Clause. *See id.*

Plaintiffs also appear to contend that the questions in the Notice do not involve a matter that arose during the administration of the Funds. (*See* Mem. in Supp. at 16-17 (arguing that "because the

Board of Trustees did not vote on a matter of fund administration, there was no action to form the basis of an arbitrable dispute").)  In considering whether something constitutes "any of the matters that arise during the administration" of the Funds, as required by the Arbitration Clause, the Court looks at the authority given to the Board by the Trust Agreements.  *See Stop & Shop Supermarket Co.*, 407 F. Supp. 2d at 521-22 (analyzing terms of parties' collective bargaining agreement to determine scope of arbitration clause).  The Trust Agreements govern Board meetings and voting at those meetings.  (*See, e.g.*, Am. Compl. Ex. A Art. IV §§ 1-6; Am. Compl. Ex. B Art. IV §§ 1-6.)  The Board is granted the right to bring and maintain lawsuits that are necessary for the collection of moneys owed to the Funds.  (*See* Am. Compl. Ex. A Art. V § 3(f); Am. Compl. Ex. B Art. V § 3(f).)  These provisions of the Trust Agreements make clear that the two disputes which Defendants seek to have arbitrated— relating to whether a particular Board "vote" was valid and the retention of outside counsel—are matters that arose during the administration of the Funds.

### D.    *Plaintiffs' Additional Arguments of Irreparable Harm*

In addition to challenging the arbitrability of the issues presented by the Notice, Plaintiffs argue that they are irreparably harmed absent a preliminary injunction because the act itself of serving the Notice constituted a breach by Defendants of their fiduciary duties and of the Trust Agreements. They also contend that absent a preliminary injunction, Plaintiffs are irreparably harmed by the expenses they will be forced to incur by engaging in the (invalid) arbitration.  (*See* Mem. in Supp. at 14-18.)

Both of these arguments—and many of their other arguments in favor of the preliminary injunction—are premised on Plaintiffs' contention that the Notice itself breached the Trust Agreements and Defendants' fiduciary duties.  As explained above, this is incorrect.  The parties "are unable to agree" on the two issues set forth in the Notice, and those issues squarely fall within the Arbitration Clause's scope.  Therefore, serving the Notice to present these matters for arbitration does

not constitute a breach of the Trust Agreements or Defendants' fiduciary duties.

Further, Plaintiffs have not established that the injury they would suffer if the Court denied their requested injunction and permitted the Notice to take effect would be "neither remote nor speculative, but actual and imminent." *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999) (per curiam) (quotation and citation omitted). Although it is not spelled out clearly in the briefing, Plaintiffs' theory of injury is that absent the injunction, it would be forced to arbitrate the removal of F&A as counsel, they would lose this dispute, F&A would be removed as counsel, the litigation against Advance would cease, and the Funds would be unable to recuperate the money owed by Advance. (*See* Mem. in Supp. at 3, 7-10, 13-14.) This theory is entirely speculative, and any injury is remote. Absent an injunction, the arbitration would proceed, enabling a neutral arbitrator to receive evidence, consider arguments, and render a decision, related only to the removal of Funds' counsel. It is uncertain whether the arbitrator would find that the removal of F&A as counsel was proper, and Plaintiffs have provided no argument that this is a likely result of the arbitration. Even if this were the arbitrator's decision, any injury to Plaintiffs would still be pure speculation. As Defendants correctly point out, the removal of F&A does not necessarily mean that the lawsuit would be dropped or that the Funds' litigating strategy would change. (*See* Mem. in Opp. at 9 n.6.) The Funds' outside counsel may provide advice to the Board, but it is not empowered to determine whether to proceed with a lawsuit. Only the Board has that power. (Am. Compl. Ex. A Art. V § 3(f) (stating that the "in its sole discretion, shall have the right to maintain any and all actions and legal proceedings necessary for the collection of the Contributions or payments provided for and required and the right to prosecute, defend, compromise, settle, abandon, or adjust . . . any such actions, suits, proceedings, disputes, claims, details and things"; Am. Compl. Ex. B Art. V § 3(f) (same).) In fact, Defendants Cassese and Curcio "voted with the Board to authorize suit against" Advance for unpaid contributions, enabling that suit to proceed. (Mem. in Supp. at 12; *see also* Am. Compl. ¶ 31.) Plaintiffs

provide no reason to believe that these two employer trustees would change their votes or their support of litigation against Advance if counsel were replaced.[9]

Finally, Plaintiffs argue that an injunction is warranted "where a party would be 'forced to expend time and resources on arbitrating an issue that is not arbitrable, and for which any award would not be enforceable.'" (Mem. in Supp. at 17.)  In support, they cite two inapposite cases.  In *Merrill Lynch Investment Managers v. Optibase, Ltd.*, 337 F.3d 125 (2d Cir. 2003) (per curiam), the Second Circuit affirmed a district court's grant of a preliminary injunction where an agreement to arbitrate was not with the party seeking the injunction, but with a related company.  *See id.* at 127, 132.  Likewise, in *Maryland Casualty Co. v. Realty Advisory Board on Labor Relations*, 107 F.3d 979 (2d Cir. 1997), the Second Circuit affirmed the grant of a preliminary injunction where the parties seeking arbitration were a group of employees that the arbitration clause explicitly excluded from its scope.  *See id.* at 983.  Because these employees were excluded from the arbitration agreement, the employer would be irreparably harmed as a result of the "time and resources [it] would expend in arbitration."  *Id.* at 985.

In contrast, Plaintiffs point to no contractual provisions specifically excluding either the disputes in the Notices or any of the parties from arbitration.  Arbitration is "the preferred method for resolving labor disputes," and "arbitration by itself imposes no [irreparable harm] to the resisting party, except perhaps in 'extraordinarily rare' circumstances."  *Emery Air Freight Corp. v. Loc. Union 295*, 786 F.2d 93, 100 (2d Cir. 1986).  Therefore, Plaintiffs cannot establish that they would be harmed by the time and resources they would expend in arbitration.

\*　　　\*　　　\*

For all the reasons stated, the undersigned finds that the disputes set forth in the Notice are

---

[9]  The litigation against Advance for unpaid contributions resulted in a consent judgment on October 14, 2020, *see supra* n.2, but the Board initiated another lawsuit against Advance on October 27, 2020 for withdrawal liability, which remains ongoing.  *See Demopoulos v. Advance Transit Co. Inc*, No. 20-CV-5186 (DRH)(ARL) (E.D.N.Y., filed Oct. 27, 2020).

subject to arbitration pursuant to the Trust Agreements, and Plaintiffs have not demonstrated irreparable harm.

## II.    Likelihood of Success on the Merits

The second part of the preliminary injunction test can be met through two alternative means: by showing a likelihood of success on the merits of their case, or "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Citigroup Glob. Mkts., Inc.*, 598 F.3d at 35 (quotation and citation omitted). Plaintiffs only argue that they are likely to succeed on the merits. They present no arguments that there are sufficiently serious questions going to the merits. (*See* Mem. in Supp. at 18-20.)

Plaintiffs offer two arguments for why they are likely to succeed on the merits. First, they claim that Barrett's vote in favor of removing F&A and Cassese and Curcio's abstentions from that vote "are clear violations of their fiduciary duties under ERISA." (*Id.* at 18-19.) Second, they argue that Defendants violated ERISA by bringing the Notice in violation of the Trust Agreements. (*Id.* at 19.)

Whether Plaintiffs' allegations unrelated to the Notice are likely to succeed sheds little light on the issue of whether to grant the preliminary injunction. Even if it turns out that Barrett's attempts to influence the Board to protect his own company—including trying to remove the law firm which had recommended bringing suit against the company—constitute violations of ERISA and LMRA, it is a separate question from whether the Notice itself is invalid, such that arbitration should be enjoined. *See Loc. One Sec. Officers Union v. N.Y. Univ.*, No. 19-CV-3143 (JPO), 2019 WL 4254026, at *4 (S.D.N.Y. Sept. 9, 2019) (holding that the plaintiff "has failed to demonstrate a likelihood of success on the merits of its claim that it is entitled to enjoin the challenged arbitration" when the parties' agreed "to have an arbitrator decide in the first instance what" disputes fall within the arbitration

agreement's scope).

Plaintiffs are also unlikely to succeed on their second argument because, as explained above, the Notice seeks to arbitrate that which can be properly arbitrated. Although Plaintiffs claim that Defendants violated the Trust Agreements, they fail to identify any terms in the Agreements that were violated.

Furthermore, none of the cases Plaintiffs cite establish that serving the Notice violated ERISA. Instead, the ERISA violations asserted in those cases pertain to undisclosed and/or alleged financial self-dealing or misuse of pension funds. *See Patterson v. Morgan Stanley*, No. 16-CV-6568 (RJS), 2019 4934834, at *7 (S.D.N.Y. Oct. 7, 2019) (dismissing plaintiffs' claims that defendants breached their ERISA duties by (1) offering option to invest in fund that paid defendants a fee, (2) continuing to offer fund that was performing poorly, and (3) failing to remove poorly performing investment option in a timely manner); *Bd. of Trs. of AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 806 F. Supp. 2d 662, 682, 693 (S.D.N.Y. 2011) (explaining that plaintiffs asserted defendants breached their ERISA duties by taking steps "to capitalize on profit opportunities for itself" and not "disclos[ing] material facts that [p]laintiffs should have known for their own protection" (quotations, footnotes, and alterations omitted)); *Chao v. Docster*, No. 1-CV-827 (NAM)(DEP), 2006 WL 1593521, at *1, *7, *9 (N.D.N.Y. Mar. 31, 2006) (holding that plaintiff was entitled to summary judgment on the claim that defendants breached their ERISA duties when they used employee 401(K) contributions to cover corporate expenses because the corporation, of which the defendants were corporate officers, was having financial difficulties).[10]  Such actions are far different from those of a party availing itself of a contractual dispute resolution procedure to resolve differences relating to fund administration.

---

[10] The final ERISA case Plaintiffs cite in support of their argument that they established a likelihood of success on the merits, *Geller v. Cnty. Line Auto Sales, Inc.*, 86 F.3d 18 (2d Cir. 1996), is not on point because it is about whether ERISA preempts common law New York fraud claims. *Id.* at 19.

Accordingly, the undersigned finds that Plaintiffs have not established the likelihood of success on the merits of their claim that issuance of the Notice was invalid, a violation of ERISA or the Trust Agreements, or a breach of any fiduciary duties.

### III.    Public Interest

Plaintiffs argue that their requested injunction is in the public interest because it "will ensure compliance with ERISA, a statute designed to ensure the protection of benefits for participants and beneficiaries in employee pension and welfare plans." (Mem. in Supp. at 20.)  This argument fails to explain why permitting the arbitration to proceed will not ensure compliance with ERISA, given that ERISA claims are arbitrable. *See Bird v. Shearson Lehman/Am. Express*, 926 F.2d 116, 122 (2d Cir. 1991) (holding that ERISA claims may be arbitrated and finding that the district court "erred in denying appellants' motion to compel arbitration of appellees' ERISA claim").  Denying the Motion is also appropriate in light of the "strong public policy in favor of arbitration." *Zheng v. Gen. Elec. Co.*, No. 15-CV-1232 (TJM)(CFH), 2016 WL 11605145, at *5 (N.D.N.Y. Nov. 16, 2016).

Accordingly, issuance of a preliminary injunction against the arbitration is not in the public interest.

### <u>CONCLUSION</u>

Based on the foregoing, the undersigned respectfully recommends that the Order to Show Cause for a Preliminary Injunction be denied and that Plaintiffs be compelled to move forward with the arbitration pursuant to the Notice.[11]

Any written objections to this Report and Recommendation must be filed within 14 days of service of this report. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Failure to file objections within

---

[11]  Defendants' Cross-Motion (Dkt. 14) seeks, in part, to compel Plaintiffs to proceed with arbitration as set forth in the Notice because "Plaintiffs opting for instituting this proceeding makes it abundantly clear that they will not submit to arbitration willingly." (Mem. in Opp. at 20-21.)  Pursuant to the findings and conclusions in this report and recommendation, the undersigned respectfully recommends that this request be granted.

the specified time waives the right to appeal any order or judgment entered based on this Report and Recommendation. *Caidor v. Onondaga Cty.*, 517 F.3d 601, 604 (2d Cir. 2008).

**SO ORDERED:**

*Peggy Kuo*

PEGGY KUO
United States Magistrate Judge

Dated:    Brooklyn, New York
          January 10, 2021